BLOCK, Appellant v. McVAY, Respondent

(126 N.W.2d 808)

(File No. 9995.   Opinion filed March 11, 1964)

Rehearing denied May 29, 1964.

**Morgan & Fuller,** Mitchell, for Plaintiff and Appellant.

**Louis B. French,** Yankton, **Everett A. Bogue,** Vermillion, for Defendant and Respondent.

PARKER, Circuit Judge. ■ This is a malpractice action. Plaintiff has appealed from the judgment and the order of the trial court directing a verdict in favor of the defendant at the close of plaintiff's case. Therefore, in reviewing the evidence on this appeal, we must, without weighing it, decide if there is any substantial credible evidence to support a verdict against the defendant considering it in the light most favorable to the plaintiff. Hansen v. Isaak, 70 S.D. 529, 19 N.W.2d 521; Lohr v. Watson, 68 S.D. 298, 2 N.W.2d 6.

Plaintiff had been a patient of the defendant, Dr. McVay, since 1948. In April, 1959, she was referred to Dr. McVay for examination concerning a gall bladder condition. On April 30, 1959, Dr. McVay examined her at the Sacred Heart Hospital at Yankton, South Dakota. At this time, Dr. McVay advised plaintiff that she should undergo major surgery for removal of her gall bladder. Plaintiff consented to this surgery which was subsequently completed with apparently successful results.

During this examination on April 30, 1959, Dr. McVay discovered a hard lump under the skin in the region of plaintiff's front lower neck above her collarbone. This lump protruded forward and was about one-third of an inch in diameter. It was located at about the junction of the inner and middle third of the collarbone, if the collarbone were considered as being divided into thirds. At the time of this examination, it was Dr. McVay's opinion that this was a tumor in a lymph node which was possibly cancerous and indicative of a spreading cancerous condition in plaintiff's body. Dr. McVay then advised plaintiff that this lump might be malignant and that it should be removed and checked by a pathologist before proceeding with the proposed gall bladder operation. At this time, Dr. McVay advised the plaintiff that an operation to remove such a lymph node tumor was a simple, ordinary and frequently performed procedure. He did not discuss with her any residual effects of such an operation, as there usually were none. On the basis of this discussion, plaintiff consented to the removal of the lump.

On the following morning, May 1, 1959, the plaintiff was brought to an operating room in the hospital where she was

prepared for the operation by injections of a local anesthetic into the area around the lump. Plaintiff remained seated upright and was conscious throughout the operation.

Dr. McVay then proceeded with the operation under the belief that the lump was a cancerous tumor of a lymph node. He first made an inch long incision into the skin and covering tissues to expose the lump. He did not explore the area around the lump before proceeding to remove it, as only the immediate area was made visible by the incision. Dr. McVay's description of the performance of the operation was as follows:

"This tumor and many like them, you can feel with the finger. This one protruded forward or anterially, you could feel it plainly under the skin and roll it around a little bit. A skin incision was made after the induction of the local anesthetic, beneath the skin there is a fatty layer, then there is a layer called fascia that is connective tissue, and then after that there are muscles in this vicinity, but none going over this except a muscle that lies within the fatty layer in the neck. The tumor was seen, it was white, hard clinically characteristic of the aforementioned cancerous lymph node, it was grasped with a grasping forceps, and using the knife described lifting it was gradually dissected out. And it's at the point, I've testified before, when the tumor was removed I realized that the base was nerve. * * * When I realized that a nerve was involved was at the instant that I could see, prior to which I could not, I could see the nerve at that location."

When he removed the lump, Dr. McVay discovered that its base had been attached to the brachial plexus (i. e., the bundle of nerves leading from the cervical region of the spine to the arm and hand). He then realized that it was not a tumor of a lymph node, as he had previously thought, but that it was a neurofibroma (i. e., a benign nerve tumor). This was subsequently confirmed by the report of the hospital pathologist. Plaintiff denied that Dr. McVay advised her of this during or after the operation. Dr. McVay testified that he told plaintiff while still in the operating room that the tumor was not cancerous but appeared to be a neurofibroma.

In the course of dissecting out the neurofibroma, some minute nerve fibers of the brachial plexus were severed. This resulted in a continuing neurological defect in plaintiff's right arm, manifested by numbness in her right arm and in the thumb of her right hand.

Immediately following the operation, plaintiff experienced this numbness in her right arm and weakness of the arm and loss of control of the thumb. The next morning at the hospital, when Dr. McVay asked plaintiff how her arm was, plaintiff told him that she had this numbness and terrific pain in her right arm. Dr. McVay told plaintiff she should use her arm as she did before and try to do the same things with it that she did before the operation. According to plaintiff, Dr. McVay did not, at that time or at any time, explain to her what caused this condition in her arm. This was controverted by Dr. McVay in his testimony.

After recuperating from the gall bladder operation and returning to her home some two weeks later, plaintiff continued to experience the numbness and loss of feeling in her arm and thumb. This made it very difficult for plaintiff to grasp and hold any object in her right hand. Plaintiff saw Dr. McVay at his office for this condition on six or eight occasions during a period of more than a year, until June 2, 1960. On the visit of June 2, 1960, plaintiff's arm was again examined by Dr. McVay and a Dr. Statler. At this time, Dr. McVay suggested to plaintiff that she consult a neurosurgeon, Dr. Carroll Brown, at Sioux City, Iowa.

Following a visit to Dr. Brown, plaintiff went to the Mayo Clinic where she was examined for the condition of her right arm and thumb by Drs. Mayen, MacCarty and Polley. She was not treated by them. Upon her return, plaintiff called upon Dr. McVay and told him that the doctors there had told her that she had an incomplete lesion of the upper nerve trunk, and that there was nothing they could do about it.

Plaintiff testified that she would not have consented to the operation had she known beforehand that it might result in the kind of injury she suffered.

Plaintiff also saw Drs. Church and Smith, neurosurgeons, at Sioux Falls, South Dakota. They also were unable to recommend anything to afford her relief from her condition.

We are not concerned in this case with the question of causation. The defendant, by his testimony, admitted that the injury to plaintiff's right arm and hand was caused by his severance of some minute nerve fibers of her brachial plexus when he removed the tumor therefrom.

Plaintiff contends that the evidence presented on her case in chief supports an inference of negligence without the aid of expert medical testimony. The record of this case shows that the only testimony presented on behalf of the plaintiff was that of the plaintiff herself and of the defendant, who testified on adverse examination.

The general rule in medical malpractice cases is that the negligence of the physician or surgeon must be ·established by the testimony of medical experts. Lohr v. Watson, supra; 41 Am.Jur., Physicians and Surgeons, § 128. The reason for the rule is that laymen are not qualified by learning and experience· to judge the medical aspects of such cases. When the reason for the rule ceases to exist, the rule no longer applies. This· gives rise to what has been termed an exception to the above rule. Therefore, in cases of medical malpractice where the phy-' sician's or surgeon's want of skill or lack of care is such that it is within the comprehension of laymen and requires only common knowledge and experience to judge it, expert evidence is not required. See Annotations 141 A.L.R. 5, 81 A.L.R.2d 597, and cases therein cited. This rule also finds support in the following cases: Myrlie v. Hill, 58 S.D. 330, 236 N.W. 287; Bennett v. Murdy, 61 S.D. 471, 249 N.W. 805; Lundgren v. Minty, 64⁻ S.D. 217, 266 N.W. 145.

Plaintiff urges that this case falls within the exception and that the trial court erred in directing a verdict against her at the close of her case upon the ground that she had failed to present expert testimony on the question of defendant's negligence. This question of the necessity of expert testimony, per-

vades all of the issues of negligence presented by the assignments of error in this case.

Plaintiff asserts that the evidence is sufficient to support a finding that the defendant was guilty of malpractice in the following particulars: (1) by undertaking to perform an operation which he was not qualified by skill and experience to perform; (2) by failing to determine at the outset that the removal of the tumor involved the brachial plexus; (3) by failing to inform plaintiff at the time he gained her consent to the operation of all of the potential hazards involved, including that of a nerve injury such as she did suffer; and (4) by failing to stop the operation when he discovered that this was a nerve tumor, advising her of this and the possibility of injuring her nerve by its removal and getting her fresh consent before continuing the operation.

■ With respect to the question of whether the defendant possessed the requisite skill to perform this operation, the only testimony in the trial record relating to that question is that of the defendant himself. From this it appears that he was a highly skilled and qualified general surgeon with over sixteen years of experience. During this time, he had removed numerous lymph node tumors and neurofibromas in the general area of the human anatomy which was involved in this operation. There is nothing in the record of this case to suggest that this type of surgery should only be performed by a neurosurgeon, as contended by plaintiff, also, there is no expert medical evidence to the effect that the defendant was unskilled in the manner in which he performed the operation. Laymen do not possess the necessary technical knowledge obviously required to evaluate this feature of the case which could only be supplied by expert medical testimony.

■ That the defendant was mistaken in his preoperative diagnosis is without dispute. However, this fact alone is not sufficient to warrant a finding of negligence. "If a physician brings to his patient care, skill, and knowledge, he is not liable to him for damages resulting from a bona fide error of judgment of which he may be guilty. The law requires a physician to base any professional decision he may make on skill and careful

study and consideration of the case, but when the decision depends on an exercise of judgment, the law requires only that the judgment be bona fide. A physician is not an insurer of the correctness of his judgment. Especially is this true in cases of doubt or where competent medical authority is divided, and the physician in question follows a course of treatment advocated by a substantial number of competent physicians in good standing in his community." 41 Am.Jur., Physicians and Surgeons, § 103. Kelly v. Hollingsworth, 44 S.D. 23, 181 N.W. 959.

As we have previously pointed out, there is no basis in this case for finding that the defendant did not possess the requisite qualifications and skill to treat the plaintiff for her condition or to perform the operation. "Physicians and surgeons are not to be held responsible for results, but only for the kind of service rendered by them." Dean v. Seeman, 42 S.D. 577, 176 N.W. 649; Irwin v. Seeman, 42 S.D. 574, 176 N.W. 652; Hanson v. Harris, 44 S.D. 457, 184 N.W. 262; Warwick v. Bliss, 46 S.D. 622, 195 N.W. 501. Thus, the unfortunate result of the operation by itself does not furnish a basis for holding the defendant liable or finding that he was negligent with respect to his diagnosis. Other than the result of the operation, there is no evidence in the record to support a finding that the defendant did not follow proper practice or that he failed to apply his skill and judgment with ordinary care in making his diagnosis. Also, there is no evidence indicating that there was any reasonable doubt as to whether he followed the proper practice prevailing throughout the medical profession. The type of evidence required upon which to base a finding of negligence in this respect must of necessity be furnished by medical experts. Laymen cannot be expected to possess the technical knowledge and experience required to intelligently second guess a physician on diagnostic procedures and the conclusions to be drawn therefrom; this is especially true in a case such as this where the lymphatic and nervous systems of the human body are involved.

Plaintiff contends that the defendant was negligent in failing to advise her, prior to the operation, that one of the possible hazards of such treatment would be a nerve injury of the kind suffered by her. She testified that had she so been advised,

she would not have undergone the operation. The rule relied upon by the plaintiff is that a doctor owes a duty to his patient to make known to such patient or someone acting properly for him the known dangers inherent in the disease that is present or in the treatment proposed so that the patient will be in a position to make an intelligent decision as to whether he will submit to the course the physician proposes to take. See Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093, modified on rehearing, 187 Kan. 186, 354 P.2d 670; Mitchell v. Robinson, Mo., 334 S.W.2d 11, 79 A.L.R.2d 1017; Salgo v. Leland Stanford Jr. University Board of Trustees, 154 Cal.App.2d 560, 317 P.2d 170; Corn v. French, 71 Nev. 280, 289 P.2d 173; Bang v. Charles T. Miller Hospital, 251 Minn. 427, 88 N.W.2d 186; DiFilippo v. Preston, 3 Storey 539, 53 Del. 539, 173 A.2d 333; Annotation 79 A.L.R.2d 1028. The difficulty encountered in applying the rule to this case lies in the fact that defendant, at the time he advised plaintiff to undergo the operation, was under the impression that the lump was a lymph node tumor. On the basis of this mistaken diagnosis, he told plaintiff that the operation for removal of the tumor was a simple, ordinary and frequently performed procedure. He did not discuss with her any residual effects of such an operation as there usually were no ill effects. There is no evidence in this case to show that there were any substantial risks or hazards inherent in an operation for removal of a lymph node tumor in this area. Again the unfortunate result of the operation does not supply this lack nor do we feel that such matters are within the common knowledge of laymen. Thus, this question also resolves itself down to whether the defendant is liable for the mistaken diagnosis. We have held that, on the record in this case, he is not.

Plaintiff further contends that, upon discovering during the course of the operation that the lump was a neurofibroma, the defendant should have stopped the operation, advised the plaintiff of this and of the likelihood of nerve damage if it was removed, and that he should not have proceeded to remove it unless the plaintiff then consented, after being so advised. Plaintiff relies on the case of Wall v. Brim, 5 Cir., 138 F.2d 478. That case involved an operation to remove a cyst in the patient's neck just back of her ear. The operation was described to the patient as

a simple one. A local anesthetic was used, as in this case. Upon making the incision, the doctor discovered that the cyst was much larger than he had thought and that it was in close proximity of the facial nerve. He then proceeded with the operation knowing there was a probability of damage to the facial nerve in removing the cyst. He did not apprise the patient of this although there was no emergency and he could have stopped the operation with safety. The court there held that a jury question was presented on the issue of negligence. However, there is one vital, distinguishing feature in this case. The defendant here did not know that the lump was a neurofibroma attached to the brachial plexus until after he had completed its removal. The damage had already been done. When he realized the true situation it was too late to stop and consult with the patient. This leads us back to the question of whether he should have known that the lump was a neurofibroma before he removed it. We have already concluded that the evidence in this case was not sufficient to present a jury question on this issue.

Upon the record in this case and for the reasons stated, we hold that the trial court was correct in directing a verdict at the close of the plaintiff's case.

Affirmed.

ROBERTS, RENTTO, HANSON and HOMEYER, JJ., concur.

PARKER, Circuit Judge, sitting for BIEGELMEIER, P. J.